972 So.2d 1108 (2008)
Michael D. BURKE, Appellant,
v.
WINDJAMMER BAREFOOT CRUISES, Appellee.
No. 3D07-1240.
District Court of Appeal of Florida, Third District.
January 30, 2008.
*1109 Buchbinder & Elegant and Harris J. Buchbinder, for appellant.
Gary W. Pollack, Miami, for appellee.
Before COPE, RAMIREZ, and SUAREZ, JJ.
RAMIREZ, J.
Michael D. Burke appeals the trial court's order granting Windjammer Barefoot Cruises, Ltd.'s motion to dismiss his counterclaim against Windjammer, without leave to amend. The trial court dismissed count I based on an arbitration clause in an employment contract and count III, because there was a pending case in the courts of Trinidad and Tobago. We reverse, based on our conclusions that Windjammer waived its right to arbitrate count I and the action in Florida was filed before the action in Trinidad.
Windjammer Barefoot Cruises, Ltd. (Windjammer), is a British Virgin Island corporation wholly owned by Windjammer Barefoot Adventures, Ltd. Windjammer Barefoot Adventures, Ltd., is wholly owned by the trustee of Captain Michael Burke's 1999 trust. The chief executive officer of the company has always been its founder, Captain Michael Burke. In June 2005, Michael D. Burke (Captain Burke's son) signed an Employment Agreement which made him Windjammer's new president and Chief Executive Officer. Paragraph 12.13 contained an arbitration clause providing, in pertinent part, that "[e]xcept for any proceeding seeking equitable remedies . . . any dispute or controversy under the agreement shall be resolved by final and binding arbitration. . . ."
Claiming that Burke breached his fiduciary duties, Windjammer's board of directors terminated Burke in September 2006. Windjammer filed a Verified Complaint on September 15, 2006, against Michael D. Burke (hereinafter "Burke"), which had three counts: count I for breach of fiduciary duty; count II for waste and misappropriation of corporate assets; and count III for injunctive relief and an accounting.
With the complaint, Windjammer also filed a Motion for Emergency Injunction, *1110 which the trial court granted. It enjoined Burke and his agents from entering Windjammer's premises in Miami, from harassing Windjammer's employees, and from holding themselves out as though Burke continued to be Windjammer's chief executive officer.
On September 20, 2006, Burke filed an Emergency Motion to Dissolve Temporary Injunction, which was heard by the trial court on September 25, 2006. At the hearing, Burke testified that he started working for Windjammer under the Employment Agreement and that pursuant to the Employment Agreement, he acted as Windjammer's President and Chief Executive Officer. The Employment Agreement was admitted into evidence. The trial court denied Burke's motion.
Further pleadings, motions and hearings took place in Miami, until November 3, 2006, when Windjammer and Windjammer Barefoot Adventures, Ltd., filed an action against Burke in Trinidad and Tobago. The action requested that the Trinidadian court: 1) restrain Burke and his agents from entering Windjammer's offices in Trinidad; 2) restrain Burke and his agents from removing any documents from Windjammer's premises; 3) restrain Burke and his agents from having access to the accounts of Windjammer's subsidiary, Maritime Preservation Limited; 4) restrain Burke and his agents from misappropriating Maritime's funds; 5) allow Windjammer and its agents full access to the office, books, etc. of Windjammer and/or Maritime; and 6) award damages, costs, and interests.
On January 19, 2007, with leave of court, Burke filed in the Miami action, his amended answer, affirmative defenses and counterclaim. count I was against Windjammer for breach of the Employment Agreement. count II was against Captain Burke, through his guardian, for his alleged misrepresentation of authority to act on Windjammer's behalf when he executed the Employment Agreement. count III was for a declaratory judgment to determine whether Windjammer or Burke owned the shares of Maritime Preservation, Ltd. The Employment Agreement was attached as an exhibit to the counterclaim. This Agreement provided that, as a bonus, Windjammer was to transfer to Burke any rights it may have in Maritime Preservation, Ltd. It also contained the arbitration clause previously mentioned.
On February, 20, 2007, Windjammer moved to dismiss counts I and III of the counterclaim. Windjammer maintained that count I must be sent to arbitration, and count III should be dismissed because of the action pending in Trinidad and Tobago. After argument, the trial court granted the motion as to counts I and III. Burke then appealed.
As to the dismissal of count I based on the arbitration clause, we must decide whether Windjammer waived its right to enforce it. Here, Windjammer initially filed a complaint containing only tort claims. Windjammer claims none of these was arbitrable. However, when, Burke filed his amended answer and counterclaim, on January 19, 2007, an arbitrable issue was injected into the case for the first time, that is, count I of Burke's counterclaim claiming breach of the employment agreement. Because the arbitration clause in question requires arbitration of "any dispute or controversy under the agreement," count I of Burke's counterclaim would be subject to arbitration unless Windjammer previously had waived the right to arbitration. Consequently, we now must address whether Windjammer's claims were arbitrable and whether it waived the right to arbitration by filing the complaint.
As the Florida Supreme Court held in Seifert v. U.S. Home Corp., 750 *1111 So.2d 633, 636 (Fla.1999), "there are three elements for courts to consider in ruling on a motion to compel arbitration of a given dispute: (1) whether a valid written agreement to arbitrate exists; (2) whether an arbitrable issue exists; and (3) whether the right to arbitration was waived." Id. at 636. There is no dispute here that there exists a valid written agreement to arbitrate. The second issue is whether Windjammer's complaint against Burke was arbitrable. The parties agree that count III of Windjammer's complaint, which sought equitable relief, was not arbitrable. Thus, if Windjammer had filed only a one-count complaint seeking an injunction, it would not have been arbitrable, and no waiver would have taken place. Without a right to arbitrate, there can be no waiver.
Windjammer's complaint contained two other counts seeking damages. Other than equitable actions, under the agreement, the parties were obligated to arbitrate "any dispute or controversy under the agreement." Although Windjammer did not attach to the complaint the parties' Employment Agreement, it alleged that Burke acted as plaintiff's chief executive officer. Burke held this position by virtue of the Employment Agreement. In delineating Burke's duties, the Verified Complaint alleged in paragraph 13:
13. As chief executive officer, the Defendant was to perform such executive and management duties as may, from time to time, be determined and assigned to the executive by the board of directors of the company, or and shall relate primarily to the business and operations of the company.
Using the exact same language, the Employment Agreement provided:
3.1 Position. During the Employment Period, the Executive . . . will perform such executive and management duties as may, from time to time, be determined and assigned to the Executive by the Board of Directors of the Company or and shall relate primarily to the business and operations of the Company.
Count I was for breach of fiduciary duty. Whether the arbitration clause required arbitration of this particular dispute is determined by the intent of the parties, which is discerned from the language used in their agreement. See, e.g., Episcopal Diocese of Cent. Fla. v. Prudential Secs., Inc., 925 So.2d 1112, 1115 (Fla. 5th DCA 2006); Citigroup, Inc. v. Amodio, 894 So.2d 296 (Fla. 4th DCA 2005).
In Seifert, the Florida Supreme Court held that an agreement to arbitrate in a contract between the parties does not necessarily mandate arbitration of a subsequent and independent tort action based upon common law duties. In that case, U.S. Home moved to compel arbitration based on a provision in the parties' contract for sale and purchase which, in language very similar to our case, required arbitration of "[a]ny controversy or claim arising under or related to this Agreement or to the Property." Id. at 635.
In determining whether the tort claim came within the contract's arbitration clause, the court held that the appropriate test was whether "the tort claim, as alleged in the complaint, arises from and bears such a significant relationship to the contract between the parties as to mandate application of the arbitration clause." Id. at 640. To aid in this determination, the Florida Supreme Court examined the contract containing the arbitration clause and the allegations of the complaint to see if there existed a "sufficient nexus" between the two. Id. at 638-42. After doing so, the Florida Supreme Court concluded the tort claim in that case did not have a sufficient relationship to the agreement so as to require submission of the cause to arbitration. Id. at 642. The Florida Supreme *1112 Court explained that none of the allegations asserted that U.S. Home's duties or obligations arose from or were governed by the contract. Id. None of the allegations in the complaint referred to or mentioned the agreement between the Seiferts and. U.S. Home. Id. Accordingly, the Florida Supreme Court was unable to conclude that the tort action had a significant relationship to the contract or that the parties in contracting necessarily contemplated the existence and arbitration of future tort claims for personal injuries based on a party's common law negligence. Id.
Windjammer relies on Episcopal Diocese, in support of its argument that the mere existence of the agreement to arbitrate was not sufficient to compel this dispute to arbitration. In that case, the Diocese alleged that it suffered damages because Prudential failed to warn the Diocese of the broker's history of mismanagement and reason for termination from employment. Id. at 1114. Like our case, the cause of action alleged was a tort action for breach of fiduciary duty. Windjammer argues, as did the Diocese, that the fiduciary concept derives from trust and agency principles recognized at common law. The Fifth District concluded that the agreements in Episcopal Diocese did not place the parties in a "unique relationship" that created new duties not otherwise imposed by law. Id. at 1116 (citing Seifert). The factual allegations in the Diocese's complaint did not rely on the agreements between the Diocese and Prudential, and the resolution of this dispute was not dependent upon the construction of those agreements. Id. "Indeed, the damages suffered by the Diocese occurred after the contracts with Prudential were terminated and after the accounts were transferred." Episcopal Diocese, 925 So.2d at 1116. In contrast, Windjammer filed this action to terminate the relationship with Burke.
We find that Hirshenson v. Spaccio, 800 So.2d 670 (Fla. 5th DCA 2001), is closer to our situation. In Hirshenson, the plaintiff sued her investment counselor and broker for fraud, negligent misrepresentation, breach of fiduciary duty, negligence, and securities violations after she lost her entire investment. Id. at 672. The court concluded that the dispute by the investor involved the suitability of the investments, an issue clearly related to the contract. Id. at 675.
Relying on Seifert, we conclude that the tort action here had a significant relationship to the contract. Unlike Seifert, we believe that "the tort claim, as alleged in the complaint, arises from and bears such a significant relationship to the contract between the parties as to mandate application of the arbitration clause." Seifert, 750 So.2d at 640. In fact, the Employment Agreement created the relationship between Windjammer and Burke. Before the agreement, the parties had no relationship. It is difficult to fathom how a breach of fiduciary duty could be established in this case without referring to what those duties were, and indeed, the initial complaint quotes verbatim from the agreement to outline what those duties were. We thus conclude that if either party had moved to compel arbitration in a timely manner, the court should have ordered it. By litigating for over five months without making such a request, Windjammer waived its right to enforce arbitration.
With respect to count III, because Windjammer's main complaint remains pending in the trial court, we treat this part of the appeal as a petition for writ of certiorari, and grant the petition. See Fla. R.App. P. 9.040(c) ("If a party seeks an improper remedy, the cause shall be treated as if the proper remedy had been sought; provided that it shall not be the responsibility of the court to seek the *1113 proper remedy."); see also Sander v. Rayman, 800 So.2d 355, 358 (Fla. 4th DCA 2001); Banco Bilbao Vizcaya, S.A. v. Naiz, S.A., 615 So.2d 233, 234 (Fla. 3d DCA 1993). We quash that part of the trial court's order that dismissed count III, which was based on the Trinidadian action, because the Miami-Dade County action was filed first. See Taylor v. Cooper, 60 So.2d 534, 535 (Fla.1952). Windjammer raised the issue of ownership of Maritime Preservation, Ltd. first in the Miami-Dade County action, before it sought relief in the Trinidad and Tobago courts. Thus, the declaratory action in count III of Burke's counterclaim should have been allowed to proceed.
Accordingly, we reverse the order under review in part and remand with instructions to reinstate count I of Burke's counterclaim. With respect to count III of the counterclaim, we treat the appeal as a petition for writ of certiorari, grant the petition and quash the order in part. We remand with instructions to reinstate count III of Burke's counterclaim.